IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

**MARINE SOLUTIONS, L.L.C.,**
a Louisiana limited liability company and
**LAURA MILLER**,

      Plaintiffs,

v.                                         **JURY TRIAL DEMANDED**

**GULF COAST AGGREGATES, L.L.C.,**
a Florida limited liability company,
**GEORGE D. SLISHER**, an individual,
and **STEPHEN C. ADDINGTON,** an
individual, and John Does 1-10,

      Defendants.
_____/

## COMPLAINT

COME NOW the Plaintiffs, MARINE SOLUTIONS, L.L.C. (hereinafter "Marine") and LAURA MILLER (hereinafter "Miller"), by and through the undersigned Counsel, and file this Complaint against Defendants, GULF COAST AGGREGATES, L.L.C. (hereinafter "GCA") and GEORGE D. SLISHER and STEPHEN C. ADDINGTON, stating and alleging as follows:

### Jurisdiction and Venue

1. This court has subject matter jurisdiction over this action under 28 U.S.C. 1332(a)(1) because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.     This court is a proper venue under 28 U.S.C. 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.  To wit, the contracts entered into and the business activities at issue occurred within this judicial district.

**Parties**

3.     Plaintiff, Marine, is a Louisiana limited liability company with a principal place of business in Metairie, Louisiana.  In 2010, Marine had two principals, Edwin Reardon and Laura Miller.  Reardon and Miller were the only members of Marine and were also long time domestic partners living together as unmarried man and wife.

4.     Defendant, GCA, is a Florida limited liability company doing business throughout Florida, with a principal address of 55502 SE CR 67, Hosford, Florida 32334.  GCA is in the business of supplying raw materials and minerals from a quarry it operates in Liberty County, Florida.

5.     Defendant George D. Slisher is a natural person who routinely conducts business in the State of Florida and was a managing member of GCA during times material to this Complaint.

6.     Defendant Stephen C. Addington is a natural person who routinely conducts business in the State of Florida and was a managing member and investor of GCA during times material to this Complaint.

**Factual Allegations**

7. Before 2010, GCA mainly marketed and sold road base aggregate (including dolomite) from the quarry it operates.

8. Sometime in 2010, Plaintiffs began researching quarries which produced "high volume" oyster shell stock for use in the wake of the BP Horizon oil spill because the demand would be substantial. Indeed, the expected restoration effort was to encompass the entire Gulf Coast, from Texas to Florida, and the predominant source of recycled oyster shells from restaurants would clearly be insufficient to meet the requirements. Plaintiffs believed that mined fossilized oyster shells would be the ideal solution to help restore oyster beds destroyed as a result of the oil spill.

9. Shortly thereafter, Edwin Reardon, one of Plaintiffs' two principals, approached Defendants Addington and Slisher of GCA about the quarry's fossilized oyster shells that GCA previously considered a "burden" because it got in the way of mining its road base aggregate products. Mr. Reardon explained that there was a developing need for restoration oyster shells in excess of known supply and this was creating an opportunity to market and sell oyster shells; and furthermore that Marine Solutions ("Plaintiff") had developed contacts/relationships within various state governments, environmental

organizations, and agricultural agencies that would be interested in purchasing the shells for oyster bed restoration projects and research.

10. Because GCA had no experience with the marketing and sale of fossilized oyster shells, it agreed to give Plaintiff Marine the exclusive right to market the quarry's fossilized oyster shells and the two companies decided to enter into the business of marketing, selling, and delivery logistics of fossilized oyster shells (hereinafter the "Joint Venture").

11. On or about June 1, 2011, Plaintiff Marine and Defendant GCA entered into the Merchant Agreement attached hereto as Exhibit A. This agreement was not drafted or reviewed by attorneys but rather, was the lay parties' best attempt to set forth most of what they agreed to do in the relationship.

12. The Merchant Agreement provides that in exchange for Marine's consulting, marketing, and sales assistance, along with other expertise and services, GCA will pay Plaintiff 6% of all revenues (hereinafter "commissions"). Final pricing decisions for "fossilized oyster" sales transactions were exclusively stipulated by the Defendants, while Plaintiffs remained totally at risk for their vested effort of creating such bidding opportunities. Due to the structure of The Merchant Agreement Plaintiff was entirely dependent upon the operational performance and fiduciary integrity of the Defendants for recovery of "front

loaded" efforts and services provided. The Merchant Agreement also states in pertinent part:

> GCA hereby agrees to pay Consultant within fifteen (15) days of payment to GCA by any customer of GCA. It is the specific intention of the Parties that the Commission is earned for the entire duration of the Term from the moment of execution of this Agreement by the Parties.

13. Before and after the Merchant Agreement was entered into, Plaintiffs put forth extensive effort and expense toward the promotion and marketing of GCA fossilized oyster shells. Approximately two years lapsed after the signing of the Merchant Agreement during which no commission income was paid to Plaintiff. Over the course of that "vested" period and following, Plaintiffs worked with marine biologist organizations to "qualify" the oyster rejuvenation efficacy of the GCA "fossilized oyster" product. In certain pending oyster restoration contract opportunities identified, Plaintiffs laboriously worked with customers and related staff to "spec-in" this rare and relatively unknown GCA product within the developing project contract solicitations to be let to bidders. In certain related bid solicitations developed, the GCA mined product was classified as a "sole source" material due to no other known "equivalent" product competition. Plaintiffs then began securing multi-million dollar contracts with multiple state governments and agencies for the supply of GCA's fossilized oyster shell stock. Within a short

5

time, GCA was supplying oyster shells to state governments for use in the Gulf of Mexico and Chesapeake Bay.

14.     For example, Plaintiffs marketed and helped broker a $6.3 million dollar purchase order for GCA's fossilized oyster shells from the Maryland Department of Natural Resources.  As part of that marketing effort, Plaintiffs made multiple trips speaking and presenting to Maryland officials, as well as arranging a cost effective rail shipment relationship with CSX for the delivery logistics instrumental to an acceptable purchase contract.

15.     As a direct and proximate result of the business relationships and opportunities procured by MARINE on behalf of the Joint Venture, GCA's revenue increased exponentially by millions of dollars.

16.     On or about May 9, 2014, the parties amended the Merchant Agreement.  Again, the amendment was accomplished by the lay parties as opposed to being an attorney drafted and reviewed expression of the parties' intent.  Among the main revisions was that Plaintiff Marine was to be paid on all sales in all states, including sales in the State of Florida.  The Amendment to the Merchant Agreement is attached hereto as Exhibit B.

17.     Sometime in late 2014 or early 2015, Reardon became aware that he was going to require a medical procedure.  While Reardon fully expected to recover completely from the medical procedure, he responsibly discussed with his

co-adventurers that the procedure would be required and the general risks involved. During that conversation, Defendants promised Reardon that Defendants would always pay the promised percentage to Marine and to protect Marine's interest regardless of what contribution Reardon could make to the Joint Venture personally. The parties specifically discussed who and how Marine would be able to continue its contribution in the event that Reardon was unable to contribute personally to the Joint Venture.

18. As sometimes does happen, the medical procedure resulted in complications and on April 5, 2015, Edwin Reardon unexpectedly passed away. However, Plaintiff Marine was still a functioning entity continued by its remaining principal and member Laura Miller, and the specified third contractors who Reardon had specifically designated to Defendants before his passing. Laura Miller, as a principal and member of Marine, had historically travelled to most business meetings with Reardon as well as many such meetings on her own. She had substantial expertise and connections within the industry and the assistance and support of those contractors that had worked for her business, Marine. Although Ms. Miller was personally devastated at the loss of Mr. Reardon, she at no time expressed any intention to dissolve or disband the business of Marine. Furthermore, Defendants contacted Ms. Miller and expressed that they would do everything that they could to assist her during this difficult time and assured her

that it would pay money owed as a result of the Joint Venture and would protect the interests of the Joint Venture. During those communications, Ms. Miller expressed both her intention to continue the business and the necessity that GCA continue to pay the "commissions" from the Joint Venture. Defendants affirmed that they would do so.

19. Upon information and belief, sometime thereafter, Defendants consulted with counsel and asked if there was any way that GCA could lawfully stop paying commissions. This was an intentional action on the part of Defendants to steal, convert, frustrate, interfere or defraud Plaintiffs. Upon information and belief, Defendants were told that there was no legal way to discontinue payment to co-adventurer, Marine. However, on or about May 2015, GCA stopped paying commissions to Plaintiff Marine for qualified sales.

20. Upon information, belief and research of counsel, GCA and the individual Defendants conspired to stop paying Plaintiff its commissions in the wake of Mr. Reardon's death, hoping that Plaintiff Marine's remaining principal and member, Laura Miller, would not realize that there were substantial commission payments past due and that Plaintiffs would be unable to pursue their rights.

21. Upon information and belief, and review of business records, GCA has failed to pay Plaintiff Marine commissions on over four million dollars

($4,000,000) in revenue collected from qualified sales jobs in Florida and Maryland. A review of business records indicates that Plaintiff is owed, at a minimum, well over $400,000 in commissions and other related reimbursable expenses.

## Count I – Breach of Contract
### (Plaintiff Marine Against Defendant GCA)

22. Plaintiff re-alleges and incorporates paragraphs 1 through 21 as if fully set forth herein.

23. This is a claim for damages for GCA's breach of the Merchant Agreement (Exhibit A).

24. Plaintiff has complied with the Merchant Agreement's terms, and all conditions precedent to bringing this action.

25. Although the Merchant Agreement requires GCA to pay 6% of all revenues to Plaintiff, GCA stopped paying Plaintiff in early 2015 despite the fact that it made millions in revenue.

26. GCA's conduct constitutes a substantial breach of the Merchant Agreement.

27. As a direct and proximate result of GCA's material breach of the Merchant Agreement, Plaintiff has suffered damages, including but not limited to all past-due commissions. Plaintiff's damages can be determined by a review of GCA's business records.

28.     Plaintiff has retained the undersigned attorneys to represent it in this action and is required to pay them a reasonable fee for their services.

WHEREFORE, Plaintiff Marine demands judgment against GCA for breach of contract, any and all damages (including but not limited to compensatory damages), together with interest both prejudgment and post-judgment, costs and attorneys' fees, and such other further relief as the Court may deem just and proper.

## COUNT II – Unjust Enrichment
### (Both Plaintiffs Against Defendant GCA)

29.     Plaintiffs re-allege and incorporate paragraphs 1 through 21 as if fully set forth herein.

30.     This Count is for unjust enrichment/restitution against Defendant GCA for failing to pay commissions and reimbursable expenses to Plaintiff and its remaining member, Laura Miller.

31.     Specifically, Defendants failed to pay money duly owing pursuant to the Agreement as Amended by both the written and oral amendments, failed to reimburse Plaintiffs for certain business expenses that Defendants requested that Plaintiff pay for (i.e. expenses related to conventions, sponsorships and hosting) while representing those expenses would be reimbursed.

32.     As a result of its wrongful and unlawful conduct of failing to pay Plaintiffs these monies, GCA has been unjustly enriched and has received a benefit

under circumstances which make it unjust to retain such benefit without giving compensation.

WHEREFORE, Plaintiffs demand judgment against GCA for unjust enrichment, and seek restitution commensurate with the amounts owed to Plaintiffs for under the Joint Venture which can be identified through business records of the parties, and for such other relief as the Court deems just and appropriate.

### Count III - Usurpation of Business Opportunity
### (Plaintiff Marine Against All Defendants)

33. Plaintiffs adopt and re-allege the foregoing allegations in paragraphs 1 through 21 above as if fully set forth herein.

34. The agreements Defendants entered into with third parties were business opportunities fitting to the activities of the Joint Venture between Plaintiff Marine and Defendants, or in line with its business, of practical advantage to it, and ones in which Plaintiff Marine had an interest or a reasonable expectancy.

35. Defendants usurped said business opportunities by performing services and delivering goods, either by themselves or through others, for their own benefit and made large profits from it.

36. Plaintiff Marine both individually and as part of the Joint Venture, was ready, willing and able to undertake the performance of services which were performed by Defendants through themselves or others.

37. Defendants breached their fiduciary duties to Plaintiff Marine by usurping the business opportunities and performing services that were contemplated by the Agreements thereby making large profits from it.

38. The afore described business opportunities were from its nature in the line of Plaintiff Marine and the Joint Venture's business and of practical advantage to them, were those in which the Plaintiff Marine, both individually and as co-adventurers, had an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of Defendants was in conflict with that of Plaintiff Marine Solutions and the Joint Venture.

39. As a result, Plaintiff Marine, both individually and as a co-adventurer, lost the profits that it would have made from the afore described business opportunities.

WHEREFORE, Plaintiff Marine prays for judgment against Defendants for compensatory damages, interest, attorney's fees, costs, a jury trial on all issues so triable, and such other relief that this Court may deem just and proper.

### Count IV- Constructive Trust
### (Plaintiff Marine Against All Defendants)

40. Plaintiffs adopt and re-allege the foregoing allegations in paragraphs 1 through 21 above as if fully set forth herein.

41. This is an action for equitable relief within the jurisdiction of this Court to impose a constructive trust on real and personal property.

42. Defendants improperly converted and utilized the business opportunities that were presented to it for its own benefit, related parties, and associates while depriving the Plaintiff from participating in said businesses.

43. Defendants performed substantial services and delivered goods to numerous companies deriving substantial profits from said services.

44. A portion of the funds derived by Defendants from the business opportunities usurped from Plaintiff Marine should in law and in equity belong to Plaintiff Marine.

WHEREFORE, Plaintiff Marine respectfully requests this Court place the assets of Defendants derived from the afore described profits in a constructive trust for the benefit of Plaintiff Marine due to the wrongful appropriation of business opportunities from Plaintiff Marine which Defendants wrongfully obtained and pray for any other and further relief this Court deems just and proper.

## Count V – Constructive Fraud
**(Plaintiffs Against All Defendants)**

45. Plaintiff re-alleges and incorporates paragraphs 1 through 21 as if fully set forth herein.

46. As alleged in Paragraphs 12 and 18 of this Complaint, Defendants represented to Marine and Miller that it would cooperate in the event of Reardon's inability to contribute personally in the future, to protect the interests of Marine, and promised to always honor Marine's interest in existing and prospective

contracts. In making those assertions, Defendants intended for Marine and Miller to place trust and confidence in Defendants and rely upon Defendants' representations and promises.

47. Plaintiffs reposed their confidence in Defendants by allowing Defendants to negotiate contracts for the benefit of the Joint Venture.

48. Plaintiffs, as the parties without control of the revenue, goods or services and suffering from the sudden death of one of its principals, was the weaker party of the two and depended on Defendants to make wise choices that would benefit rather than harm Plaintiffs.

49. Defendants took advantage of and abused the implied fiduciary and confidential relationship of their co-adventurer by:

    a) not acting in the Joint Venture or Plaintiffs' best interest;

    b) using for its own economic benefit and other Defendant related parties the business relationships and revenue of Plaintiffs Merchant Agreement efforts;

    c) contacting, contracting with and providing services and goods to third parties companies without the knowledge, consideration, or participation of Plaintiffs;

    d) preventing Plaintiffs from participating, contributing and/or adding value to the operations conducted with third parties;

  e) After Ed Reardon's death, Defendants conspired to break the contract between the parties and stop paying commissions to Plaintiff with the hope that Miller would not notice; and/or

  f) failing to report purchase orders that Marine was entitled to commissions for and concealing the nature of such purchase orders to avoid paying Plaintiff commissions that it was entitled to.

50. As a result of Defendants' constructive fraud, Plaintiffs sustained the following damages:

  a) lost profits from goods and services which could and should have been provided by the Joint Venture to potential new customers from April 2015 to the present;

  b) revenue from contracts and relationships existing in April 2015.

WHEREFORE, Plaintiffs pray this Honorable Court for the following relief:

 A) Compensatory damages in an amount to make Plaintiffs whole for the loss of profits and business sustained as a result of the fraud by Defendants and their agents and subsidiaries;

 B) Prejudgment interest calculated at the statutory rate on the liquidated damages suffered by Plaintiffs for lost profits caused by Defendants;

 C) An award of costs and fees in favor of Plaintiffs as provided by law;

D)   Punitive Damages against Defendants; and

E)   Any and all other relief that this Honorable Court deems to be just and equitable.

## Count VI – Negligence
### (Plaintiffs Against Defendants Slisher and Addington)

51. Plaintiffs re-allege and incorporate paragraphs 1 through 21 as if fully set forth herein.

52. This is a cause of action for negligence against Defendants George D. Slisher and Stephen C. Addington, individually.

53. At all times material to this claim, Defendants Slisher and Addington were personally responsible for carrying out certain responsibilities of the Joint Venture, including but not limited to payment of commissions and reimbursement expenses to Plaintiffs.

54. Defendants Slisher and Addington owed Plaintiffs a duty to act reasonably and in good faith in regards to the relationship of the parties, including but not limited to payment of commissions and reimbursement expenses to Plaintiffs.

55. Defendants Slisher and Addington, individually and personally, committed the following acts and/or omissions:

   a.   Failed to pay Plaintiffs commissions and reimbursement expenses as they became due;

      b.    Induced and forced Plaintiff Marine to defer commissions (which Plaintiff Marine believes exceeds $100,000) for a State of Maryland job on grounds that the quarry needed cash flow to operate, and ultimately failing to pay such commissions;

      c.    Failed to reimburse Plaintiffs for certain business expenses that Defendants requested that Plaintiffs pay for (i.e. expenses related to conventions, sponsorships and hosting) while representing those expenses would be reimbursed by Defendants;

      d.    After Edwin Reardon's death, Defendants conspired to break the contract between the parties and stop paying commissions to Plaintiff Marine with the hope that Miller would not notice; and/or

      e.    Failed to report purchase orders that Plaintiffs were entitled to commissions for and concealing the nature of such purchase orders to avoid paying commissions that Plaintiffs were entitled to.

56.    At all times material to this claim, the Defendants Slisher and Addington had personal involvement in the actions and/or omissions stated above and directly participated in such acts.

57. Defendants Slisher and Addington owed a duty to Plaintiffs to exercise reasonable care in regards to the parties' obligations in such a manner to avoid injury or damages to Plaintiffs.

58. Defendants were in control of GCA's business operations and failed to perform the basic duties of paying commissions and/or expenses, and actively misrepresented and concealed facts to avoid paying Plaintiffs such amounts.

59. Defendants negligently failed to exercise reasonable care relating to the parties' business obligations, and failed to take reasonable precautions in protecting Plaintiffs' interests as it relates to the payment of commissions and expenses.

60. As a result of Defendants Slisher's and Addington's acts, Plaintiffs suffered serious economic harm, including but not limited to actual damages in amounts exceeding $400,000.

61. The actual amount of damages is easily determinable from a review of Defendants' records.

WHEREFORE, Plaintiffs demand judgment against Defendants Slisher and Addington for negligence, any and all damages which flow from such negligence, together with interest both prejudgment and post-judgment, costs and attorneys' fees, and such other further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues triable at law by a jury.

Dated:  August 2, 2016         **VARNELL & WARWICK, P.A.**

By: s/ Janet R. Varnell
**JANET R. VARNELL, FBN:  0071072**
**BRIAN W. WARWICK, FBN:  0605573**
**STEVEN T. SIMMONS, JR., FBN:  0091654**
*jvarnell@varnellandwarwick.com;*
*bwarwick@varnellandwarwick.com;*
*ssimmons@varnellandwarwick.com*
*kstroly@varnellandwarwick.com*
P.O. Box 1870
Lady Lake, FL  32158
Telephone: (352) 753-8600

***Attorneys for Plaintiffs***